Ian D. Berg (Bar No. 263586)
**ABRAHAM FRUCHTER,**
 **& TWERSKY, LLP**
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Tel:    (858) 792-3448
Fax:    (858) 792-3449
*iberg@aftlaw.com*

**KANTROWITZ, GOLDHAMER**
**& GRAIFMAN, P.C.**
Gary S. Graifman
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Tel: (845) 356-2570
Fax: (845) 356-4335
ggraifman@kgglaw.com

***Counsel for Plaintiffs***

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HARRIET STEINBERG and EDWARD VOGEL, derivatively on behalf of HEWLETT-PACKARD COMPANY, | ) ) ) Case No. CV 14- |
| Plaintiff, | ) ) |
| v. | ) **VERIFIED SHAREHOLDER** |
| | ) **DERIVATIVE COMPLAINT** |
| LEO APOTHEKER, ANN M. LIVERMORE, SHANE V. ROBISON and MARGARET C. WHITMAN, | ) ) ) |
| | ) **DEMAND FOR JURY TRIAL** |
| Defendants, | ) ) |
| and | ) ) |
| HEWLETT-PACKARD COMPANY, a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) |

Plaintiffs Harriet Steinberg and Edward Vogel ("Plaintiffs") by their undersigned counsel, allege upon personal knowledge as to themselves and their own acts, as well as upon information and belief as to all other matters based upon, *inter alia*, the investigation made by and through their attorneys, which investigation included, among other things, a review of documents filed with the U.S. Securities and Exchange Commission (the "SEC"), communications with counsel for Hewlett-Packard Company ("HP" or the "Company"), news releases, media reports and publicly available sources concerning the Company, as follows:

## INTRODUCTION

1.       This action arises from HP's paying $11.1 billion to acquire Autonomy Corporation plc ("Autonomy" or "AU"), a British software company, without engaging in a proper due diligence investigation of Autonomy, its results and operations.  The driving force at HP in its quest to purchase Autonomy was then Chief Executive Officer ("CEO") Leo Apotheker.  Apotheker, along with HP's then Chief Strategy Officer Shane V. Robison, negotiated the terms of HP's acquisition (the "Acquisition") of AU with Michael Lynch, AU's founder, and they reached agreement at a hotel in Deauville on the Normandy coast.  Apotheker and Robison then purportedly oversaw the due diligence performed by HP and convinced the HP board of directors (the "Board") that sufficient due diligence had been performed and that the Acquisition should be approved.  However, Apotheker and Robison did not act with the care that ordinarily prudent persons in like positions would exercise under similar circumstances by failing to have adequate due diligence performed.  As a result, HP paid billions of dollars more for Autonomy than it was worth and which it would have paid for AU had it properly conducted due diligence.  On November 20, 2012, HP announced an impairment charge of approximately $8.8 billion in connection with the Acquisition, amounting to an astounding 80% of the price which HP paid for AU.

2.       This incredibly costly breach of fiduciary duties was compounded when upon discovering the true state of affairs relating to AU's operations in May 2012, the Company and its then CEO, Margaret C. Whitman, continued to make public statements about the Acquisition without revealing the likelihood that fraud in the reporting of Autonomy's results prior to the

1   Acquisition was the reason that AU was not making its expected contribution to HP's reported

2   revenues and earnings.  These material misstatements were subsequently found by this Court to

3   be actionable under Section 10(b) of the Securities Exchange Act of 1934 and have exposed the

4   Company to liability and potentially hundreds of millions of dollars in additional damages.

5       3.      Moreover, despite knowing about the likely fraud at Autonomy, and that HP's

6   stock price was artificially inflated, Whitman and Ann M. Livermore, the other HP executive on

7   the Board, continued a share repurchase program and HP bought approximately 13.7 million

8   shares of its common stock at artificially inflated prices at a total cost of approximately $250

9   million from May to October 2012.[1]  Whitman and Livermore failed to act with the care that

10  ordinarily prudent persons in like positions would exercise under similar circumstances by

11  failing to stop HP's share repurchase program when they knew the stock price was artificially

12  inflated.

13      4.      On December 4, 2012, Plaintiffs made a demand (the "Demand") on HP's Board

14  to, *inter alia*, investigate the facts and circumstances surrounding the Acquisition and to institute

15  litigation against the parties responsible for causing HP losses from activities relating to the

16  Acquisition.  The Board established a demand review committee (the "DRC") to review the

17  relevant facts and make recommendations to the Board.  Notwithstanding the passage of more

18  than 15 months from the time of the Demand, HP has refused to communicate the precise

19  recommendations of the DRC, the precise bases for those recommendations or the actions of the

20  Board.  Instead, the Board has shrouded its proceedings in secrecy with the intent of avoiding

21  scrutiny of its investigation and having the reasonableness and good faith of its actions properly

22  evaluated.

23      5.      Thus, although Plaintiffs' counsel had discussions with the DRC's counsel, those

24  discussions were covered by a strict confidentiality order which does not allow their contents to

25  be revealed even in a pleading filed under seal.  Plaintiffs have continued to seek an answer from

---

[1] As described below, a former AU executive informed HP about the fraud during May 2012.  HP did not disclose the information to the public until November 2012.  The data on the share repurchases is from May through October 2012.  Thus, the exact amount of the stock repurchases made when HP knew of the AU fraud is not known at this time, but more precise information can be learned in discovery.

HP and the DRC as to the precise recommendations of the DRC, the basis for those recommendations and the actions taken by the Board. Those requests have been made orally, by letter, and finally through a demand for books and records pursuant to 8 Del. C. §220 (the "220 Demand"). Over the course of more than one month, the Board and DRC have evaded those requests and failed to provide Plaintiffs with the requested information notwithstanding Plaintiffs' offer to maintain the confidentiality of those documents and only include them in a Court filing to the extent they were placed under seal.

6.      The refusal to provide the requested information demonstrates that the DRC's recommendation and the Board's actions -- whatever they may be – cannot withstand careful scrutiny and are not the product of a good faith or reasonable analysis of the relevant facts. Therefore, Plaintiffs are filing this action derivatively on behalf of HP based upon an improper refusal of the Demand to seek recovery on behalf of the Company.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as a result of the parties having complete diversity and the amount in controversy exceeding $75,000, exclusive of interest and costs. Plaintiffs are citizens of New York or New Jersey. Nominal Defendant HP is a citizen of Delaware where it is incorporated and California where its principal place of business is located. The Defendants are all citizens of states other than New York or New Jersey.

8.      Venue is proper in this District pursuant to 28 U.S.C. §1391. Nominal Defendant HP maintains its principal place of business in this District. At least one of the Individual Defendants resides or maintains an office in this District. Moreover, a substantial part of the acts and conduct complained of herein have occurred in this District.

## PARTIES

**Plaintiffs**

9.      Plaintiff Harriet Steinberg is, and has been, a shareholder of HP continuously since prior to the acts alleged herein. She is a citizen of New Jersey.

10.     Plaintiffs Edward Vogel is, and has been, a shareholder of HP continuously since prior to the acts alleged herein.  He is a citizen of New York.

**Nominal Defendant**

11.     Nominal Defendant HP is a Delaware corporation with its principal executive offices located at 3000 Hanover Street, Palo Alto, California 94304.  The Company sells, among other things, computing systems, printing systems and informational technology services.  HP is a citizen of California and Delaware.

**Defendants**

12.     Defendant Leo Apotheker ("Apotheker") was HP's CEO, President and a director from November 2010 to September 22, 2011.  Apotheker determined that HP should acquire AU and negotiated some of the final terms of the Acquisition with Lynch.  Apotheker's employment agreement provided him with a base pay of $1.2 million, a target annual bonus of 200% of base pay, a long-term incentive award of 76,000 shares of time-based restricted stock vesting in equal amounts annually over a two-year period, 304,000 performance-based restricted units ("PRUs") for the two-year performance period ending October 31, 2012, and an additional 304,000 PRUs for the three-year performance period ending October 31, 2013.  He also was given a sign-on equity award of 80,000 shares of time-based restricted stock vesting in equal amounts annually over a two-year period and 120,000 PRUs for the three-year performance period ending October 31, 2013.  In addition, Apotheker received a cash signing bonus of $4 million, a pro rata portion to be re-paid if terminated for cause within 18 months, and an additional cash payment of $4.6 million as reimbursement for foregone non-competition payments from his former employer and for relocation expenses.  Apotheker's separation agreement with the Company provided him with $7.2 million in cash severance payments and accelerated vesting of 156,000 shares of restricted stock.  He also received a $2.4 million bonus for fiscal 2011.  Apotheker also retained the right to receive future payouts under two of the three PRU awards granted to him.  His total compensation for fiscal 2011 was calculated to be $30.4 million.  On information and belief, Apotheker is a citizen of a foreign state and/or of California.

1    13.    Defendant Ann M. Livermore ("Livermore") has been a HP director since June

2  2011.  Livermore served as Executive Vice President of the former HP Enterprise Business from

3  2004 until June 2011 and has served has served as an Executive Advisor to the CEO since then.

4  Prior to that, Livermore served in various other positions with HP in marketing, sales, research

5  and development, and business management since joining the company in 1982.  Because

6  Livermore was an HP employee, she did not receive any separate compensation for her Board

7  service.  During fiscal year 2012, her base salary from HP was $850,011, she received bonuses

8  of $1,062,514, and other compensation of $38,494.  On information and belief, Livermore is a

9  citizen of California.

10    14.    Defendant Shane V. Robison ("Robison") was HP's Executive Vice President and

11  Chief Strategy and Technology Officer from May 2002 until approximately November 1, 2011.

12  Robison was reported to be the main architect of many of HP's larger transactions, including its

13  purchase of EDS (defined below).  HP's mergers and acquisitions team reported to Robison

14  rather than HP's CFO.  Robison was involved in the negotiations to purchase AU and helped

15  obtain approval for the Acquisition within HP and getting it finalized.  During 2011, Robison's

16  compensation from HP was approximately $9 million, of which $781,250 was salary.  On

17  information and belief, Robison is a citizen of California.

18    15.    Defendant Margaret C. Whitman ("Whitman") has been a HP director since

19  January 2011.  Whitman has served as President and Chief Executive Officer since September

20  2011.  Because Whitman became an HP employee during fiscal year 2011, she did not receive

21  any separate compensation for her Board service.  During fiscal year 2011, her total

22  compensation from HP was $16,518,930.  For fiscal year 2012, Whitman's total compensation

23  from HP was $15,362,142.  On information and belief, Whitman is a citizen of California.

24    16.    Defendants Apotheker, Livermore, Robison and Whitman are, at times, referred

25  to herein as the "Individual Defendants."

26    17.    Each of the Individual Defendants owed to HP and its shareholders duties of

27  loyalty, care, candor, good faith, fair dealing and diligence.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                                          - 5 -

18.     By reason of their positions, and their role in orchestrating the Acquisition, Apotheker and Robison had access to non-public information concerning Autonomy and its true value as well as the due diligence purportedly undertaken in connection with the Acquisition.  By reason of their positions, Whitman and Livermore, beginning in May 2012, had access to the non-public information that Autonomy had engaged in accounting improprieties prior to the Acquisition to inflate its results.

19.     Each of the Individual Defendants breached the duties they owed to HP and its shareholders – Apotheker and Robison by allowing HP to consummate the Autonomy Acquisition without having a proper due diligence review from being conducted; and Whitman and Livermore for allowing HP to repurchase its shares while knowing those shares were overvalued because of Autonomy's fraud.

**SUBSTANTIVE ALLEGATIONS**

**The Company**

20.     HP is a leading global seller of personal computers, printers and other technology products and services.  It sells products to individual consumers and businesses, and has customers in the government, health and education sectors.

**HP's Poor Track Record With Major Acquisitions**

21.     In recent years, HP has made a number of acquisitions that have proven disastrous for the Company, wasting billions of dollars on questionable purchases.  Since 2008, HP has made acquisitions of more than $32 billion, but has also written down billions of dollars in connection with those acquisitions.  In 2008, HP acquired Electronic Data Systems ("EDS") for approximately $13.9 billion, purportedly to strengthen its technology consulting services.  Robison was stated to be the main architect of that purchase.  In July 2012, HP wrote off $8 billion of that acquisition.

22.     In 2010, HP bought Palm, a maker of smartphones, for $1.2 billion.  HP primarily wanted to acquire Palm's webOS operating system.  But, webOS never worked out for HP, and in the Fall of 2011, HP wrote off $885 million in connection with that purchase.

23.     In July 2012, HP wrote down $1.2 billion from its $19 billion merger with Compaq in May 2002.

### HP Announces the Autonomy Acquisition

24.     On August 18, 2011, HP announced in a press release that it would acquire Autonomy for approximately $11.1 billion.  In the press release, HP's then CEO and President Apotheker touted the purchase and described Autonomy, *inter alia*, as a "highly profitable and globally respected software company, with a well-regarded management team."

25.     Also on August 18, 2011, during a conference call, defendant Apotheker stated about Autonomy that:  "They have demonstrated a strong consistent track record of double-digit revenue growth."  Apotheker further stated:  "Autonomy has grown its revenues at a compound annual rate of approximately 55% and adjusted operating profit at the rate of approximately 83% over the last 5 years.  We're buying a very strong business . . . ."

26.     At the time, Autonomy was the largest software company in Britain and the second largest software company in Europe.  Its software sought to analyze data for marketing patterns and advise clients on matters such as where the client should increase marketing resources.  It sought to find patterns in unstructured data, such as e-mails, online videos and web surfing.  HP stated at the time that Autonomy was the key to its transformation into a higher margin seller of software.  Defendant Apotheker, while speaking positively about the Acquisition, also announced that HP was abandoning two other major product lines (smartphones and tablet computers) to refocus HP on software, and that Autonomy was the major component of that refocusing.  Apotheker wanted HP to purchase Autonomy, in part, to transform itself from a low-margin producer of hardware to a high-margin software company.  Thus, it was imperative that Apotheker and Robison ensure that the due diligence paid particularly close attention to Autonomy's software business and revenue.

27.     At the time HP decided to buy Autonomy, Apotheker was pushing to transform the Company from primarily a seller of hardware into one that primarily sold software.  Apotheker stated about the Acquisition:  "Together with Autonomy we plan to reinvent how both structured and unstructured data is processed, analyzed, optimized, automated and protected."

As subsequently reported in *The New York Times*, with the announcement of the Acquisition and the dropping of two major products, Apotheker was shifting strategy unexpectedly.  He believed that HP needed to move more aggressively into software.  *See* Quentin Hardy and Michael J. del la Merced, "Hewlett's Loss:  A Folly Unfolds By the Numbers," *The New York Times*, November 21, 2012.

28.     Apotheker was the driving force behind HP's decision to pursue Autonomy.  He participated in many of the discussions with Autonomy's CEO Michael Lynch ("Lynch") and agreed with Lynch on the final terms of the Acquisition while at a resort in France.  Robison generally took the lead in negotiations with AU.

29.     On September 13, 2011, at a Deutsche Bank technology conference, Apotheker stated regarding the Autonomy Acquisition and HP's valuation of it:  "We have a pretty rigorous process inside HP that we follow for all our acquisitions, which is a DCF-based model, and we try to take a very conservative view at this."  Apotheker also stated about Autonomy and its synergies with HP that:  "We did that analysis at great length, in great detail, and we feel that we paid a very fair price for Autonomy.  And it will give a great return to our shareholders."

30.     In response to a question during the September 13th conference about what specific steps HP took to investigate concerns about AU's accounting prior to announcing the Acquisition, Apotheker stated:  "We have and are running an extremely tight and very professional due diligence process.  I've got to tell you I have challenges with the question itself.  Autonomy is a publicly traded company in the UK.  And they are, therefore, audited like any other FTSE company, and they're being audited on very professional standards.  And, therefore, that's where we pick up the trail and do our due—that's the basis of our due diligence."

31.     Also at the September 13th conference, in response to a question about Autonomy's business, Robison stated that if you look at the data, Autonomy's IDOL platform was "growing nicely and will continue."  Robison further addressed questions about Autonomy's revenue flow and the software sales cycle, and stated:  "these patterns are easy to explain once you actually look at the real data around how the business is performing."

32.     Apotheker presented the Acquisition to the Board, which relied on Apotheker and his support for the transaction.  Robison also helped Apotheker in gathering support for the Acquisition within HP and getting it finalized.  Regarding the due diligence conducted by HP, Apotheker stated that it was "meticulous and thorough."

33.     In fact, at the time of the purchase, Apotheker and Robison, in breach of their fiduciary duties, did not have a good understanding of Autonomy's worth and consequently, HP vastly overpaid for it because of the accounting improprieties.  The purchase price was a multiple of 12.6 times Autonomy's 2010 revenue and was regarded as being wildly overpriced at the time, even before the accounting issues were revealed.  Had Apotheker and Robison had proper due diligence conducted, HP would have discovered Autonomy's true worth and would not have acquired Autonomy or would have paid a much lower price to purchase it.

34.     Indeed, in a *Reuters* article dated November 30, 2012, it was reported that HP did no due diligence as to Autonomy's financial statements.  While the Board relied on Apotheker's and Robison's claims that due diligence was conducted, virtually no critical analysis of Autonomy's financial statements was performed prior to consummating the Acquisition.  Although Autonomy's revenues had been growing, a large portion of that growth was because of acquisitions.  Questions about Autonomy's accounting and its valuation were raised by analysts and others well before the Acquisition was consummated, but Apotheker and Robison ignored those questions, and told that Board that the necessary due diligence had been performed.

**Autonomy Previously Tried To Sell Itself To Others**

35.     Prior to its agreement with HP, Autonomy marketed itself to other companies, and was said to have been shopped by investment bankers prior to HP's involvement.  At a time in 2011 when the market value of Autonomy was approximately $5 billion, Michael Dell, founder of Dell Computers, believed that price overvalued Autonomy.  Dell stated he wouldn't consider acquiring Autonomy at that price.

36.     Similarly, in April 2011, Oracle Corporation ("Oracle") deemed Autonomy overvalued at $6 billion.  Details about Autonomy CEO Lynch's attempt to sell Autonomy to Oracle were disclosed publicly by Oracle CEO Larry Ellison ("Ellison") in September 2011,

prior to HP's closing of the Acquisition.  After Ellison's statement, Lynch denied trying to sell Autonomy to Oracle, whereupon Oracle, on its Website, provided information showing Autonomy's presentation to it, which valued Autonomy at $5.7 billion as of January 23, 2011. Ellison stated that Autonomy was desperately seeking a buyer and described Autonomy's asking price as being "absurdly high."  *See* Katherine Rushton, "Oracle boss lets rip at Autonomy's Mike Lynch," *The Daily Telegraph*, September 30, 2011.  Not only did this information raise questions about Autonomy's value and the price HP agreed to pay, but also, it raised questions about Lynch's veracity.

37.     Subsequently, in a *New York Times* article dated December 1, 2012, an Oracle executive stated that:  "After doing the math, we couldn't make it [a purchase of Autonomy] work.  We couldn't figure out where the numbers came from.  And taking the numbers at face value, even at $6 billion it was overvalued."  James B. Stewart, "From H.P., A Blunder That Seems to Beat All," *The New York Times*, December 1, 2012.

**Analysts Are Skeptical of Autonomy's Accounting and Value**

38.     At least as early as 2009 questions existed about Autonomy's financials. Questions were raised that Autonomy's deferred revenue was much lower than industry standards, whereas software companies typically had a high degree of deferred revenue because of service obligations.  In a November 2009 article in the *Sunday Telegraph*, it stated that Autonomy's growth rate should "ring alarm bells for investors."

39.     During July 2010, several analysts raised concerns about Autonomy.  RBC noted that "[g]ross [m]argins excluding amortization at 86% were below historical averages of 89-90% due to the unusual inclusion of hardware."  RBC also noted that EBIT margins were impacted by "higher than expected marketing costs."  (July 26, 2010, pg. 1).  Societe Generale stated that their EBIT estimates for Autonomy was conservative because of higher sales and marketing expenses.  (July 23, 2010, p. 2).  UBS mentioned a "hardware pass-through."  They also noted that "[w]e expect Q3 gross margins should still see a c.100-200bp drag from hardware sell-through of the remaining Arcpliance inventory."  (July 23, 2010, p. 2).  Arcpliance was an archiving service introduced by Autonomy in October 2009 and was touted as a turn-key

archiving appliance.  Deutsche Bank noted that "[g]ross margin of 86% was below the 88-89% guidance (DB: 88%) due to additional costs associated with hardware sales."  Deutsche Bank also noted higher than expected sales and marketing expense.  (July 22, 2010, p. 1).  JP Morgan noted that estimates missed consensus with an overall "weak set of numbers."   JP Morgan also noted that Arcpliance revenue recognition was similar to license revenue as it was all recognized up front as opposed to other types which were recognized over a longer period.  (July 21, 2010, p. 1).

40.     Questions about Autonomy's financial statements persisted into the fourth quarter of 2010.  JP Morgan's analysis was that Autonomy was recognizing revenues in a more aggressive manner for certain large deals by recognizing most of the revenue up front and then the remainder over a longer period of time.   (Oct. 25, 2010, p. 6; *see also* report dated Sept. 8, 2010 p. 4).  KBC Peel Hunt ("Peel Hunt" - brokerage/advisory firm focused on small and mid-cap UK firms) suggested that Autonomy's growth (as Autonomy defined it) was exaggerated and inconsistent with calculations Autonomy made in 2009.  (Oct. 22, 2010, p. 2).  Peel Hunt reduced their growth calculation based on what they believed to be significant hardware sales.  Peel Hunt also noted that Autonomy seemed to be suggesting that hardware sales were a common feature within software sales.  Peel Hunt additionally stated that "Autonomy's definition of organic growth is misleading."  (*Id.* at p. 3)  Peel Hunt believed that Autonomy could not simply acquire companies and add IDOL (Autonomy's main product) to preexisting offerings and call that organic growth.  Deutsche Bank noted that sales and marketing expense was ramped up in 2Q2010.  (Oct. 21, 2010, p. 5).  A Deutsche Bank analyst, who was a former Autonomy employee who operated a software division, stated that Autonomy's management structure and internal controls were "more representative of a start-up."  UBS discussed the increase in hardware inventories for "appliance" sales (*i.e.*, hardware with prepackaged software).  (Oct. 20, 2010, p. 4).  Canaccord noted the continued high sales and marketing expenses.  (Oct. 19, 2010, p. 1).  JP Morgan expressed its concerns over the Company's model of growth by acquisition, which raised issues as to its actual underlying growth.  (Oct. 13, 2010, p. 2-3).

41.     During the first quarter of 2011, analysts continued to question Autonomy's financials.  Deutsche Bank stated that it believed Autonomy's "shortfall in [sales and marketing] spend[ing]" could limit its growth potential.  (Feb. 1, 2011, p. 1).  Numis Securities Ltd.'s ("Numis") report titled "Slow dark clouds" specifically stated that revenue was "potentially flatterred" by hardware sales because the 4Q2010 gross margin of 86.5% was similar to other quarters in which hardware sales weighed down gross margins.  (Feb. 1, 2011, p. 1).  Numis also questioned management's representations concerning organic growth.

42.     During the second quarter of 2011, JPMorgan wanted more clarity on how Autonomy recognized revenues from the big deals it announced as to the amount of licensing revenues (which were recognized upfront) vs. ongoing revenue because the recognition of big deals could have a material impact on any one quarter.  (Apr. 27, 2011, p. 2).  Canaccord stated that: "[w]e believe Autonomy may be improving revenue growth by bundling lower margin/capex heavy infrastructure services with software sales."  (Apr. 26, 2011, p. 1).

43.     Just prior to the announcement of the Autonomy Acquisition, analysts questioned Autonomy's transparency regarding its financial information.  Deutsche Bank stated that: "Analysts usually like to look at new licenses revenues as a gauge for the health of a software business.  However, for Autonomy it is often questioned as to whether this is the critical metric due to transparency and the different business model it follows."  (Aug. 1, 2011, p. 5).  Indeed, while Autonomy's financials were generally regarded as being opaque, that information did not seem to lead Apotheker or Robison to obtain more definitive information about Autonomy's financials.

44.     In the aftermath of the announcement of the Autonomy Acquisition on August 18, 2011, analysts seemed to agree that HP was over-paying.  Credit Suisse said the deal looked too expensive.  (Aug. 19, 2011, p. 1-2, 5-6).  BMO Capital Markets expressed concerns about the organic growth of Autonomy.  (Aug. 19, 2011, p. 2).  RBC expressed "valuation concerns." (Aug. 19, 2011, p. 1).  Susquehanna Financial Group noted that the acquisition appeared "fairly expensive." (Aug. 19, 2011, p. 2).  Jefferies believed the price was "full" and that a sharp negative price reaction was to be expected.  (Aug. 19, 2011, p. 1).  Deutsche Bank stated that the

1   Autonomy premium was "rich."  (Aug. 19, 2011, p. 1).  Toni Sacconaghi of Sanford C.

2   Bernstein wrote that the purchase was "value-destroying."  Richard Kugele of Needham &

3   Company stated that Wall Street's remaining confidence in HP was eroded by the "seemingly

4   overly expensive acquisition."

### HP Changes CEOs, the Acquisition Closes and Robison Leaves

6       45.     Shareholder reaction to the announcement of the Acquisition was generally

7   negative, and HP stock price decreased after that announcement, declining from $29.51 per share

8   on August 18, 2011 to $23.60 per share on August 19, 2011, an approximate 20% decrease.

9   Despite Apotheker's claims that HP had a thorough review process before reaching agreement to

10  purchase Autonomy, *The New York Times* reported that a large shareholder questioned Raymond

11  J. Lane ("Lane"), HP's then Chairman of the Board, if the Company performed an analysis of

12  when Autonomy would be accretive and the growth assumptions used, and Lane appeared

13  unfamiliar with any DCF analysis.  *The New York Times* further reported that "a chorus of

14  disgruntled major shareholders" complained to Lane in the days after the announcement, and

15  according to Mr. Sacconaghi, "[n]ot one person thought H.P. should do this deal. . . . They were

16  begging Ray Lane to find a way out of the deal, but he said they were stuck."  James B. Stewart,

17  "From H.P., A Blunder That Seems to Beat All," *The New York Times*, December 1, 2012.

18      46.     On September 22, 2011, HP announced that the Board terminated Apotheker from

19  his CEO and President positions.  Apotheker was granted a $7.2 million severance payment, a

20  $2.4 million bonus and accelerated vesting of 156,000 shares of restricted stock.  Whitman was

21  selected as the new CEO and President on September 22, 2011.  The Autonomy Acquisition

22  closed in October 2011.  Robison left HP on or about November 1, 2011.  It was reported that he

23  was pushed out.

### HP Announces Charge in Connection with Autonomy Acquisition

25      47.     On November 20, 2012, HP announced that it had taken an $8.8 billion charge in

26  connection with its Acquisition of Autonomy.  More than $5 billion of the write-off was stated to

27  be because Autonomy's results were the product of accounting fraud.  HP's press release stated,

28  among other things, that some former members of Autonomy's management had inflated that

company's financials by accounting improprieties prior to HP's Acquisition in order to mislead investors and potential purchasers.

48.     The November 20th press release further stated that HP was informed about the questionable accounting by a senior member of Autonomy's leadership team, who revealed that these practices occurred prior to the Acquisition. HP stated that it then launched an internal investigation into those issues, which included a forensic review by Pricewaterhouse Coopers ("PwC") of Autonomy's historical financial results. Because of that investigation, HP stated that it now believed Autonomy was substantially overvalued at the time HP acquired it because of the misstatement of its financial performance.

49.     During the announcement of the write-down, as reported by *the Inquirer* on November 21, 2012, it stated: "Effectively Whitman spent 10 minutes on a call on Tuesday telling journalists that the firm had no idea of what the firm bought with shareholder's money, hardly a message to inspire confidence in the company." Yet, based on Apotheker's and Robison's representations regarding due diligence, the Board went forward despite questions about Autonomy's accounting, and "decided to pay what even at the time was seen to be far too much for ["Autonomy"]." *See* Lawrence Latif, "Autonomy write-down shows HP repeated its mistakes," *the Inquirer*, November 21, 2012.

50.     At the time of the announcement of the write-down, Whitman blamed the Acquisition on Apotheker and Robison. Whitman stated: "The two people who should have been held responsible are gone," referring to Apotheker and Robison. She further stated on November 20, 2012, during a CNN interview about the write-down that the Board relied on the due diligence that was performed. She stated: "And that's what you do when you are on a board, you rely on the recommendations of management and the financials audited by a legitimate financial accounting firm."

51.     After the announcement of the write-down, Apotheker stated that he was "stunned and disappointed" to learn of HP's allegations about Autonomy. While commenting on Apotheker's defense of the purchase process, one publication stated: "It's hard to tell how much Apotheker actually believes what he's saying and how much he's trying to cover himself for

when the eventual, inevitable lawsuits start flying.  While he was ousted as HP's CEO just months after the Autonomy deal went through, it still happened under his watch.  The accounting firms HP hired should have done a better job, sure, and Autonomy shouldn't have lied in the first place.  But the buck stops at the (former) CEO."  In addition, Patrick Moorhead, a tech analyst stated about the write-down:  "This is absolutely under Apotheker's misguided leadership . . . . [Whitman] inherited this from him."

### Apotheker and Robison Ignored Red Flags and
### CFO's Warning Prior to the Acquisition

52.     Prior to HP's Acquisition, several red flags existed, which would have alerted Apotheker and Robison to the problems with Autonomy's accounting had they ensured that proper due diligence was conducted.  In addition to the above analyst reports, CFRA, an accounting research firm, published reports questioning Autonomy going back to 2007.  CFRA raised questions about Autonomy's lack of nonacquisition-driven revenue growth, and its unsustainable contributions to cash flow.  Given that CFRA published multiple reports raising these issues, it is doubtful a proper due diligence investigation would have failed to discover them.

53.     Moreover, as reported in *The New York Times*, in July 2009, Kynikos Associates LP, ("Kynikos") an investment firm, wrote a detailed report criticizing Autonomy's accounting. In its 2009 note, Kynikos wrote that Autonomy deferred revenue appeared much too low. Because software companies rely on service contracts with revenue being earned over the term of the contract, revenue is typically deferred.  Autonomy's low deferred revenue was regarded as a sign to question its reported revenue.  It added that the company might have masked the underperformance with acquisitions.  *See* Peter Eavis, "H.P. Claim Highlights a Gray Area in Software Sales," *The New York Times*, November 21, 2012.  Kynikos' founder, James Chanos, stated that it was "pretty clear if you look at Autonomy's books over time that it was a very, very aggressive roll-up."  Moreover, Chanos saw Autonomy as a shorting opportunity because its

reported margins of about 50 percent did not seem to translate into cash flow.  He also questioned how it could report double-digit growth in software license revenue while its rivals reported shrinking sales.  "The Inside Story of How A Desperate HP Tricked Itself Into Wasting $11 Billion On Autonomy," *businessinsider.com*, November 30, 2012.

54.     At the time of the Acquisition, Autonomy's growth was the result, in part, of its mischaracterizing sales of low-margin hardware as software.  For fiscal year 2010, Autonomy reported receivables that were higher than deferred revenues, which is unusual for a software company.  Software companies typically have deferred revenue for the use of their products and continuing service and support.  Rather than being listed as a receivable, such future payments are listed as deferred revenue.  However, Autonomy, for fiscal year 2010, reported receivables of $330 million and deferred revenue of $177 million, an anomalous situation that should have raised a red flag.

55.     Autonomy's record keeping also was not close to ideal.  HP's General Counsel John F. Schultz (" Schultz") was quoted as stating about Autonomy's books that "[c]ritical documents were missing from the obvious places" and that it did not have a "set of well-maintained books" to discern the company's financials.  *See* Peter Eavis, "H.P. Claim Highlights a Gray Area in Software Sales," *The New York Times*, November 21, 2012.  In fact, it was later reported that Autonomy recognized revenue improperly on transactions with its business partners although no Autonomy products were purchased, and engaged in round-trip transactions where Autonomy and the other entity would purportedly purchase each other's products without a true business purpose, but merely to increase revenue at each entity.

56.     It was also reported after the write-down was announced that HP's "internal team was aware of talk about accounting irregularities at the time the deal was struck."  *See* Ben Worthen, "H-P Says It Was Duped, Takes $8.8 Billion Charge," *The Wall Street Journal*, November 21, 2012.  In fact, HP was shown significant documents which should have given rise to suspicion, and possibly a clear way to walk away from the deal, but Apotheker pushed it through.  *See* Quentin Hardy and Michael J. del la Merced, "Hewlett's Loss:  A Folly Unfolds By the Numbers," *The New York Times*, November 21, 2012.  As one commentator stated:  "I

don't know a soul who thought this deal was a good one to begin with except Leo Apotheker . . . . " Jim Cramer, "Real Money, Jim Cramer: Sell, Sell, Sell HPQ," *Thestreet.com*, Nov. 25, 2012.

57. Besides CFRA, Kynikos and the analysts mentioned above, it was reported by *The New York Times* that hedge fund investors were skeptical about Autonomy for several years and questions about its numbers were in the market. At an investment forum in October 2012, John Hempton stated that: "It was dead easy to spot that Autonomy's statements weren't right." *See* Peter Eavis, "H.P. Claim Highlights a Gray Area in Software Sales," *The New York Times*, November 21, 2012. However, with Apotheker and Robison pushing the transaction, it was approved.

58. Dan Mahoney from CFRA, who had covered Autonomy until the Acquisition, stated that Autonomy "had the hallmarks of a company that recognized revenue too aggressively." He further stated that neither U.S. nor international accounting rules would allow companies to recognize revenue where there was a risk the customer might not pay, which Autonomy seemed to have done. Moreover, some deals were closed by Autonomy offering to buy the customer's products. In July 2009, Autonomy sold $9 million in software to VMS Information ("VMS") and agreed to buy about $13 million in licenses for data from VMS. The revenue from the VMS deal was booked as sales revenue, but the cost of data it purchased was included in sales, marketing or other expenses – not considered a key indicator of a growing tech company's core profitability. VMS's former CEO stated that Autonomy's agreement to buy the VMS data helped pave the way for VMS's purchase from Autonomy. VMS filed for bankruptcy in 2011 and owed $6.4 million to Autonomy at that time. In other transactions with resellers, Autonomy recognized the total amount of the deal as revenue upfront even though the reseller only paid Autonomy as it sold the software. Such a transaction occurred with Tikit Group PLC ("Tikit") in 2010 whereby Autonomy recognized about $6.4 million although it would only be paid as the software was sold by Tikit to others. Ben Worthen, Paul Sonne and Justin Scheck, "Long Before the H-P Deal, Autonomy Had Red Flags," *The Wall Street Journal*, November 27, 2012.

59. Despite the numerous red flags about Autonomy, only one HP officer seemed to

raise doubts about the Acquisition.  According to *Fortune*, HP's CFO Catherine A. Lesjak ("Lesjak") told the Board that it was too expensive and not in the Company's best interests, and that she could not support it.  After the write-down was announced, *The New York Times* acknowledged the *Fortune* article about Lesjak's opposition, and reported that it was told Lesjak was afraid that she would be fired for being outspoken against the Acquisition, and that the week after it was announced, she canceled an appearance at a road show that was to defend the deal and its terms.  James B. Stewart, "From H.P., A Blunder That Seems to Beat All," *The New York Times*, December 1, 2012.

60.    Lesjak's concerns and the other red flags were ignored because Apotheker and Robison assured the Board that the due diligence was sufficient, and the Board voted unanimously to approve the Acquisition.

61.    After the write-down, Toni Sacconaghi, a technology analyst at Sanford C. Bernstein, stated that the Autonomy Acquisition "will arguably go down as the worst, most value-destroying deal in the history of corporate America."  James B. Stewart, "From H.P., A Blunder That Seems to Beat All," *The New York Times*, December 1, 2012.  Mark Williams, a Boston University finance professor and former Federal Reserve bank examiner, stated about HP's claims against Autonomy that:  "Just to say 'we paid too much because of fraud' doesn't negate the fact of inadequate due diligence . . . . "

### A Whistleblower Results in HP Commencing An Internal Investigation

62.    HP began an internal investigation into the Acquisition in May 2012 after a whistleblower, a senior finance officer from Autonomy, informed HP's General Counsel that Autonomy had cooked the books before the Acquisition.  *See* Ben Worthen, "H-P Says It Was Duped, Takes $8.8 Billion Charge," *The Wall Street Journal*, November 21, 2012.  The whistleblower came forward after Lynch was fired by Whitman that month.  Schultz stated that the Autonomy executive also provided emails and financial information that substantiated the claim.  *Id.*

63.    The resulting investigation found, among other things, that Autonomy's financials were incorrect in a number of ways, including that Autonomy booked revenue for sales that had

not yet occurred and that it recognized hardware sales as higher-margin software sales in order to make it appear that Autonomy's software business was performing better and was more profitable than it actually was performing.  Autonomy reported deferred revenue as reported earnings without booking the liabilities involved in providing services back to the sources of the uncollected revenues.  Additionally, Autonomy engaged in "round-trip transactions" in which entities buy and sell goods from each other primarily to inflate the entities' revenues.  Without its aggressive accounting, Autonomy likely had operating margins of 28 to 30 percent rather than the 40 to 45 percent it reported.  *See* Peter Eavis, "H.P. Claim Highlights a Gray Area in Software Sales," *The New York Times*, November 21, 2012; Ben Worthen, "H-P Says It Was Duped, Takes $8.8 Billion Charge," *The Wall Street Journal*, November 21, 2012.

64.     According to *The New York Times*, among the accounting issues discovered by HP was that Autonomy sold hardware but booked the sales as software sale at times, which reduced expenses and inflated margins because hardware typically has a much smaller profit margin than software.  Such booking then was used for Autonomy's growth calculation.  An HP official claimed that the Autonomy hardware was sold at a 10% loss, but was disguised as a marketing expense.  It was also claimed by HP that Autonomy relied on value-added resellers, who acted as middlemen and sold software on behalf of the company.  HP claimed that those middlemen reported sales to customers that did not exist.  Another tactic which HP claimed Autonomy used was to recognize licensing revenue upfront before it received payment, which also inflated gross profit margins.  *See* Quentin Hardy and Michael J. del la Merced, "Hewlett's Loss:  A Folly Unfolds By the Numbers," *The New York Times*, November 21, 2012.

### HP and Whitman Discuss Autonomy Without Revealing Fraud

65.     Defendants Whitman and Livermore knew about the accounting improprieties at least as early as May 2012 when the senior member of Autonomy informed Schultz about the improprieties, yet waited six months to disclose this information publicly, while at the same time, HP and Whitman were making public statements about HP and Autonomy that continued to mislead the public.

66.     On May 23, 2012, HP published a press release and held a conference call accompanying its filing with the SEC of a Form 8-K announcing financial results for the second quarter of 2012 ended April 30, 2012.  During the May 23rd call, Whitman responded to a question about Autonomy's weakness by stating:

> When Autonomy turned in disappointing results, we actually did a fairly deep dive to understand what had happened here.  And in my view, this is not the product.  Autonomy is a terrific product.  It's not the market.  There is an enormous demand for Autonomy.  It's not the competition.  I was wondering, is there a competitor that we didn't see, and the answer to that is no.  This is classic entrepreneurial Company scaling challenges.

67.     On June 5, 2012, during an interview with Arik Hesseldahl from *All Things D*, Defendant Whitman stated in response to a question about Autonomy:

> In my view, this is the classic case of scaling a business from startup to grownup. Going through that barrier of a billion dollars in sales is not easy because you can't run the organization at $1.5 billion the same way you did at $500 million. You just can't.  And for many entrepreneurs, processes and discipline are dirty words, and you have to have those things, especially within the context of HP. I know exactly how this world [works].  My view was that we needed to make a change to someone who can take Autonomy to the next level.  I have every confidence that Autonomy will be a very big and very profitable business.  It's taking advantage of a big shift in the industry toward big data and unstructured data.  But we needed different leadership to age Autonomy, and by that I mean age it kind of like wine.

68.     Whitman, on May 23rd and June 5th, made specific statements about Autonomy's weak performance, omitting material information about possible accounting fraud at Autonomy that was being considered.  Once Whitman decided to speak about Autonomy's performance, she was obligated to provide the full truth that it may be fraud as the reason for Autonomy's weak performance not the "scaling challenges" that she referenced.  Whitman could have declined to answer the questions.  She chose to respond and was required to have at least mentioned that other explanations were being considered to explain Autonomy's performance.

69.     On September 10, 2012, HP filed with the SEC its Form 10-Q for the third quarter ended July 31, 2012.  In that Form 10-Q, it was stated:

During its fourth quarter of fiscal 2012, HP will perform its annual goodwill impairment review for all of its reporting units as of August 1, 2012.  If there are changes in HP's stock price, or significant changes in the business climate or operating results of its reporting units, HP may incur additional goodwill impairment charges.  The Software segment includes $14.6 billion of goodwill, of which $7.7 billion relates to the legacy HP software business and $6.9 billion relates to the Autonomy acquisition.  Based on HP's last annual goodwill impairment review completed as of August 1, 2011, the excess of fair value over carrying value of the legacy HP software business was 38% of the carrying value, which is lower than that of HP's other reporting units.  At the time of the Autonomy acquisition in October 2011, the fair value of Autonomy approximated the carrying value.

70.     The above statement in the Form 10-Q about Autonomy's carrying value was a material misstatement.  By the time of the Form 10-Q, Defendants Whitman and Livermore knew that HP may have substantially overpaid for Autonomy.  Defendants Whitman and Livermore knew of the ongoing investigation into Autonomy at that time and that they could not state without qualification that when it was acquired, Autonomy's fair value approximated its carrying value.

71.     These above misstatements on May 23, 2012, June 5, 2012 and September 10, 2012 have exposed the Company to liability for securities fraud.  Shareholders have brought class action securities fraud actions against the Company and Whitman, and claims made against them in connection with the above statements have been sustained, potentially costing the Company millions of dollars in damages.

72.     In addition, while knowing that HP likely purchased Autonomy at an inflated price, Whitman and Livermore allowed the continuation of HP's program of repurchasing its stock despite knowing that the price was artificially inflated because of the Autonomy Acquisition.  During fiscal year 2012, ended October 31, 2012, HP repurchased 67 million shares for approximately $1.6 billion.  For the period from May to October 2012, HP repurchased approximately 13.7 million shares at a cost of approximately $250 million.

DERIVATIVE AND DEMAND REFUSAL ALLEGATIONS

73.     Plaintiffs bring this shareholder derivative action on behalf of HP to redress injuries suffered, and to be suffered by the Company.  Plaintiffs will adequately and fairly represent the interests of HP in enforcing and prosecuting its rights.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

74.     On December 4, 2012, Plaintiffs made the Demand on the Board to investigate and institute litigation against any person who caused the Company to suffer damages in connection with HP's Acquisition of Autonomy and the subsequent failure to timely disclose accounting irregularities at Autonomy and the substantial impairment of its value.  A copy of that letter is attached hereto as Exhibit 1.

75.     Rather than formally respond to Plaintiffs' Demand, the Board has been delaying and obfuscating.  More than one year after the Demand, Plaintiffs discovered in court filings that the Board appointed Ralph Whitworth, Gary Reiner and Robert Bennett as the DRC in order to conduct an investigation into the Demand and allegations made in other shareholder derivative actions.  On February 28, 2014, in a filing made with the Court in a related matter, HP stated that:  "the HP Board met to consider the [DRC's] recommendations and, on the basis of those recommendations, made decisions with respect to the actions that it deemed to be in the best interests of the [C]ompany and its shareholders."  The Company, in its filing, however, refused to reveal the precise recommendations made by the DRC or actions taken by the Board.  Similarly, HP has failed to provide any formal notification to Plaintiffs of the precise contours of the DRC's recommendations and the Board's actions with respect to the Demand.

76.     On March 19 and 20, 2014, counsel for Plaintiffs met with counsel for the DRC.  The information discussed was only for settlement purposes and could not be disclosed.  Plaintiffs were not allowed to take any materials from the meetings and the ability to take notes at the meetings was severely constrained.

77.     On March 26, 2014, Plaintiffs' counsel sent a letter to counsel for the DRC requesting a response to the Demand as well as any documents on which the DRC and Board relied in making their decisions.  Plaintiffs have not received a response to this request.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                                    - 22 -

78.     On April 14, 2014, Plaintiffs made the 220 Demand, requesting that the Company produce certain corporate books and records in connection with the investigation by the DRC or the Board, including any report prepared by the DRC.  The purpose of the request was to: determine which claims the DRC and Board decided to pursue, if any; determine whether the actions of the DRC and the Board in responding to the Demand and conducting the investigation were reasonable and a good-faith exercise of the Board's business judgment; determine whether the DRC and Board acted in good faith in carrying out their fiduciary duties; determine whether the DRC's investigation and recommendation to the Board were reasonable; and determine whether to pursue legal action in connection with the Board's decisions.

79.     On April 23, 2014, counsel for the DRC sent a letter to Plaintiffs' counsel but did not confirm the Board's decisions.  Instead, the April 23rd letter does not directly address the issue.  The April 23rd letter does not offer the DRC's report to Plaintiffs and Defendants have refused to produce such report.  The letter is conclusory and does not allow the investigation to be scrutinized.  No explanation has been provided as to how the DRC reached its conclusions.

80.     On April 24, 2014, Plaintiffs' counsel sent a letter to the DRC's counsel, accepting the offer of production of the DRC's and Board's resolutions based on the DRC's findings and recommendations, pursuant to the terms of the August 2013 Confidentiality and Non-Disclosure Agreement.  Plaintiffs requested these (and other) documents to determine the reasonableness and good faith of the DRC's work.

81.     At the time of the filing of this action, the information requested in the April 24, 2014 letter had not been produced.  The DRC's report to the Board continues not to be produced, and the Board has not made that report public.  The actions the Board has decided to take and the reasons for those actions has not been provided

82.     The Board has refused to provide Plaintiffs with all the information requested and has refused to provide Plaintiffs with the actions it is taking and its reasons for the actions.

## CLAIM FOR RELIEF

## COUNT I

### (Against the Individual Defendants For Breach of Fiduciary Duty)

83.     Plaintiffs repeat and reallege each and every allegation made above as if fully set forth herein.

84.     The Individual Defendants owed HP and its shareholders fiduciary duties of loyalty (including duties of candor and good faith) and care.  Pursuant to those duties to HP and its shareholders, Defendants Apotheker and Robison were required to ensure that HP engaged in sufficient due diligence before having HP purchase Autonomy and were required to maintain controls and policies to assure HP complied with its obligations.  Moreover, Defendants Whitman and Livermore, once they learned of AU's fraud, had a duty to stop HP from repurchasing its shares at prices that were artificially inflated by AU's fraud.

85.     The Individual Defendants, however, breached their duty of loyalty by Apotheker's and Robison's failure to have required due diligence performed and by their failure to stop the Company from going forward with the Acquisition, despite the lack of necessary due diligence, at a vastly inflated price, with the many questions about Autonomy's accounting that existed.

86.     In addition, even after HP was informed by a whistleblower of the accounting irregularities at Autonomy in May 2012, HP and Whitman made public statements about Autonomy and the Acquisition that were materially false and misleading, exposing the Company to significant liability and damages for alleged violations of the federal securities laws.

87.     By virtue of Whitman's positions as Chief Executive Officer and President of HP, and Livermore's position as CEO advisor, they were informed in May 2012 about Autonomy's accounting irregularities prior to the Acquisition, which caused Autonomy's financial performance to be artificially inflated and for Autonomy to appear more valuable than it was. Nonetheless, Whitman and HP made public statements, with disregard of these known facts that rendered those public statements materially false and misleading, and which continued to artificially inflate the market price of HP stock.

88.     By virtue of their positions of control and authority, Whitman and Livermore were able to, and did, directly and indirectly, control the content of the aforesaid statements relating to the Company and/or the failure to correct those statements in a timely fashion once

they knew or were deliberately reckless in not knowing that those statements were no longer true or accurate.  Whitman and/or Livermore caused or controlled the preparation and/or issuance of those public statements identified above and the failure to correct such public statements containing misstatements and omissions of material facts as alleged herein.

89.  Despite knowing, at least from May 2012, that the price of HP's stock was artificially inflated because of AU's fraud, Defendants Whitman and Livermore allowed HP to continue repurchasing its stock at those artificially inflated prices.

90.  Whitman's and Livermore actions operated as a breach of duty to HP, which repurchased millions of shares of the Company's common stock.  From May to October 2012, HP purchased approximately 13.7 million shares of its common stock at artificially inflated prices for a total cost of approximately $250 million.

91.  Had the materially adverse facts been properly disclosed, Whitman and Livermore would not have been able to cause HP to purchase its common stock at the inflated prices it paid.

92.  As a result of the Individual Defendants' breaches of their fiduciary duties, HP has suffered significant harm and is entitled to damages.

## COUNT II

### (Against the Individual Defendants For Contribution and Indemnification)

93.  Plaintiffs repeat and reallege each and every allegation made above as if fully set forth herein.

94.  This claim is brought derivatively by Plaintiffs on behalf of the Company against the Individual Defendants for contribution and indemnification.

95.  HP is alleged to be liable to the putative class in the pending securities fraud actions for misleading the public about the Autonomy Acquisition.  In the event the Company is found liable to those persons for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing or reckless acts or omissions of some or all of the Individual Defendants as alleged herein, and the Company will be entitled to receive contribution from those Individual Defendants in connection with the securities fraud

actions against the Company currently pending in this District.  In the event the Company is found liable to those persons for violating principles of state and/or common law, the Company's liability will result, in whole or in part, from the intentional, knowing, reckless or grossly negligent acts or omissions of those Individual Defendants as alleged herein, and the Company will be entitled to receive contribution or indemnification form those Defendants to the extent such claims are or will be brought against the Company.

96.   Plaintiffs on behalf of HP have no adequate remedy at law.

## COUNT III

### (Against the Individual Defendants For Unjust Enrichment)

97.   Plaintiffs repeat and reallege each and every allegation made above as if fully set forth herein.

98.   The Individual Defendants received salaries, bonuses, stock awards and other compensation in connection with their positions and employment by HP.  They were unjustly enriched because they each breached their fiduciary duties they owed to HP, as set forth above.

99.   As a result of their breaches of fiduciary duties, each of the Individual Defendants should be ordered to disgorge the compensation they received from HP.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand judgment as follows:

A.   Declaring that the Plaintiffs may maintain this action on behalf of HP and that Plaintiffs are adequate representatives;

B.   Declaring that Defendants have breached, participated and/or aided and abetted the breach of their fiduciary duties to HP;

C.   Entering judgment against Defendants and directing Defendants to account to HP for all damages, and any interest thereon, sustained by the Company by reason of the wrongdoing alleged herein;

D.      Directing HP to take all necessary steps to reform and improve its corporate governance and internal procedures to protect the Company and its shareholders from a repeat of the wrongful conduct alleged herein;

E.      Ordering Defendants to reimburse the Company and to disgorge all compensation they received as a result of the wrongful conduct alleged herein;

F.      Awarding Plaintiffs the costs and disbursements of this action, together with reasonable attorneys' fees and the reimbursement of expenses; and

G.      Granting such other further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues.

Dated: May 16, 2014                    **ABRAHAM, FRUCHTER & TWERSKY, LLP**

By: _____
        Ian D. Berg   (Bar No. 263586)

12526 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel:    (858) 792-3448
Fax:    (858) 792-3449
*iberg@aftlaw.com*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
Jeffrey S. Abraham
Lawrence D. Levit
Philip T. Taylor
One Penn Plaza; Suite 2805
New York, New York 10119
Tel:    (212) 279-5050
Fax:    (212) 279-3655
*jabraham@aftlaw.com*
*llevit@aftlaw.com*
*ptaylor@aftlaw.com*

 **KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
Gary S. Graifman
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT                    - 27 -

Tel: (845) 356-2570
Fax: (845) 356-4335
*ggraifman@kgglaw.com*

**GREEN & ASSOCIATES, LLC**
Michael S. Green
522 Route 18, Suite 5
East Brunswick, New Jersey 08816
Tel:  (732) 390-5900

***Counsel for Plaintiffs***

## **VERIFICATION**

HARRIET STEINBERG hereby verifies and states under the penalty of perjury: I have read the foregoing Verified Shareholder Derivative Complaint (the "Complaint") in this action. The matter contained therein is true insofar as concerns my acts and deeds. Upon information and belief, the matter contained in the Complaint is true insofar as it concerns the acts and deeds of other persons.

Verified this 8th day of May, 2014.

HARRIET STEINBERG

<u>VERIFICATION</u>

EDWARD VOGEL hereby verifies and states under the penalty of perjury: I have read the foregoing Verified Shareholder Derivative Complaint (the "Complaint") in this action. The matter contained therein is true insofar as concerns my acts and deeds. Upon information and belief, the matter contained in the Complaint is true insofar as it concerns the acts and deeds of other persons.

Verified this 12th day of May, 2014.

EDWARD VOGEL